**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 3:10-cr-00069 JWS |
| ) | |
| vs. ) | ORDER AND OPINION |
| ) | |
| TRACE RAE THOMS and ) | [Re:   Motion at Docket 57] |
| JENNIFER ANNE THOMS, ) | |
| ) | |
| Defendants. ) | |

## I.  MOTION PRESENTED

At docket 57, defendant Trace Rae Thoms ("Thoms") moves to suppress all evidence derived from search warrants in this case.  Defendant Jennifer Anne Thoms joined the motion at docket 62.[1]  The government opposes the motion at docket 63. Defendants' reply is at docket 84.[2]

A *Franks* hearing was held on February 7 and 11, 2011.  Trace Thoms filed a closing argument at docket 165.  Jennifer Thoms filed a closing argument at docket 166.  The government filed a supplemental summation at docket 169, to which Trace Thoms replied at docket 170, and Jennifer Thoms replied at docket 171.

At docket 174, Magistrate Judge John D. Roberts filed an initial report recommending that defendants' motion to suppress be denied.  Trace Thoms objected

---

[1]The defendants are referred to collectively herein as "defendants" or "the Thomses."

[2]Jennifer Thoms joined the reply at docket 83.

to the report at docket 176.  Jennifer Thoms joined those objections at docket 177.  The government replied at docket 181.  Judge Roberts issued a final report and recommendation at docket 182, in which he declined to modify the initial report.

## II.  BACKGROUND

On February 22, 2010, the Alaska State Troopers executed a search of the Thomses' property in Wasilla, Alaska.  The search was conducted pursuant to a warrant issued by a state judge based on the affidavit of Investigator Kyle S. Young ("Young").  The warrant authorized a search for evidence of Misconduct Involving a Controlled Substance IV ("MICS IV"), a state crime.  The search produced evidence of a large marijuana grow operation.

Young's affidavit is twenty-two pages long.[3]  The first section is labeled "preliminary matters" and provides a description of Young's background, training, and experience.[4]  The second section is titled "typical marijuana grow" and contains Young's factual deductions regarding marijuana grow operations.[5]  The third section is labeled "personal knowledge" and recounts generalities derived from Young's experience with marijuana grow operations.[6]  The fourth section is titled "turning to the specifics of this case" and contains the most relevant statements for purposes of this motion.

Young's affidavit provides as follows:

Approximately 0120 hours on 2-22-10, I smelled a strong odor of cultivating marijuana while driving on West Scarlett Circle, off of Scarlett Drive in Wasilla.  I immediately stopped my vehicle and checked the wind direction and noted that I was downwind of the first residence on the right on West Scarlett Circle, off of Scarlett Drive.  The residence is a brown colored two-story structure, enclosed by a chain link fence.

I parked my vehicle and walked along the roadway and noted that a strong odor of cultivating or recently harvested marijuana was present, when I got

---

[3]Doc. 57-2; doc. 57-3; doc. 57-4.

[4]Doc. 57-2 at 1–2.

[5]*Id.* at 2–6.

[6]*Id.* at 6; doc. 57-3 at 1–4.

-2-

near the suspect residence described above.  I continued to check the wind direction and determined that the first residence on the right, at what appears to be the beginning of West Scarlett Circle, was the source of the odor.  I could not see any structure up wind of the suspect residence and it appears that there is a pond or swamp behind the residence and no other nearby structures (upwind) that could have been the source of the odor.

Based upon the odor of marijuana in the proximity of the suspect residence and the wind direction at the time, I believe that the source of the odor was the first residence on the right on Scarlett Circle, described above.[7]

The affidavit details Young's subsequent investigation.  Young examined maps and "determined that the property was owned by Trace Thoms and Jennifer Thoms."[8]  He ran background checks on both defendants and noted Trace Thoms' 2005 conviction for MICS IV.[9]

Young then "contacted [Matanuska Electric Association,] confirmed that the electrical subscriber for the property was Jennifer Thoms . . . and learned that there were two electrical accounts at the property."[10]  The affidavit notes that a typical homeowner would pay around $90.00 per month, owners of a larger residence would pay approximately $176.00 per month, and the Thomses were paying approximately $788.00 per month.[11]

The affidavit then describes that, in Young's experience, "just smelling the odor of cultivating marijuana on the outside air is indicative of a commercial grow operation."[12]  The affidavit includes a section titled "marijuana grow data" which recounts Young's catalogue of "smell cases"–cases "where the odor [of marijuana] was

---

[7]Doc. 153-2 at 4.

[8]*Id.* at 5.

[9]*Id.* at 5.

[10]*Id.* at 5.

[11]*Id.* at 5–6.

[12]*Id.* 153-2 at 7.

either smelled by officers while driving past the suspect location, approaching the suspect location on foot or at the front door of the location attempting contact or during contact with the occupants."[13]  The data is presented as a study and purports to indicate that over 96% of the time, when an officer smells marijuana on the outside air, there is more than four ounces of marijuana present.[14]  The presentation is statistically flawed, but ultimately irrelevant to the present motion.

Execution of the search uncovered approximately 500 marijuana plants and other evidence of a commercial marijuana grow.  Subsequent search warrants were issued authorizing searches of the Thomses' bank accounts, computers, and business records.[15]

Thoms sought a *Franks* hearing and argued 1) that Young intentionally or recklessly misrepresented facts in his affidavit; 2) that Young intentionally or recklessly failed to disclose material facts in his affidavit; and 3) that, nonetheless, the warrant was facially unsupported by probable cause.  Judge Roberts determined that only the contention that Young intentionally misrepresented that he smelled marijuana while driving by the Thomses' property merited a *Franks* hearing.  The scope of the *Franks* hearing was accordingly limited to the truthfulness of Young's statement that he smelled a strong odor of marijuana coming from the Thoms residence.[16]

---

[13]*Id.* at 8.

[14]Such a statistic would be relevant to probable cause because in Alaska, "an adult may possess any amount of marijuana less than four ounces in their home, if their possession is for personal use."  *State v. Crocker*, 97 P.3d 93, 95 (Alaska 2004).

[15]*See* doc. 153-3; doc. 153-4.

[16]Doc. 140 at 10–14.

Case 3:10-cr-00069-RRB   Document 186   Filed 04/22/11   Page 4 of 25

### III.  STANDARD OF REVIEW

The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."[17]  When reviewing a magistrate judge's report and recommendation in a case such as this one, the district court conducts *de novo* review of all conclusions of law,[18] and any findings of fact to which objections have been made.[19]  Uncontested findings of fact are reviewed for clear error.[20]

### IV.  DISCUSSION

A *Franks* hearing allows a criminal defendant to challenge the truthfulness of statements in an affidavit supporting a search warrant.[21]  "The defendant must prove by a preponderance of the evidence that there was a knowing and intentional falsehood or a reckless disregard for the truth, and that the challenged statement was essential to the finding of probable cause."[22]  If the defendant carries that burden, the proper remedy is suppression.[23]

The Thomses object to the report's finding that Young was truthful in his sworn statement that he smelled a strong odor of marijuana coming from the Thomses' property.  The Thomses also object to the report's related conclusion that they failed to establish by a preponderance of the evidence that Young was intentionally or recklessly untruthful.  Consistent with the standard articulated above, the court will conduct *de novo* review of the findings and conclusions in Section I.E of the report.[24]

---

[17]28 U.S.C. § 636(b)(1).

[18]*Barilla v. Ervin,* 886 F.2d 1514, 1518 (9th Cir. 1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996).

[19]28 U.S.C. § 636(b)(1).

[20]*Taberer v. Armstrong World Industries, Inc.,* 954 F.2d 888, 906 (3d Cir. 1992).

[21]*Franks v. Delaware*, 438 U.S. 154, 171–72 (1978).

[22]*United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988).

[23]*United States v. Leon*, 468 U.S. 897 (1984).

[24]*See* doc. 174 at 17–33.

Case 3:10-cr-00069-RRB   Document 186   Filed 04/22/11   Page 5 of 25

The Ninth Circuit has described the preponderance standard as requiring a showing that the object of proof is "more likely than not."[25] The overarching question is whether the Thomses demonstrated that it is more likely than not that Young intentionally misstated in his affidavit that he smelled a strong odor of marijuana when driving by the Thomses' residence. The evidence that the Thomses presented bears on the probability that Young smelled marijuana as he claimed. If the defendants showed by a preponderance that it was highly improbable that Young smelled marijuana, then it is more likely than not that his affidavit was untruthful.

In short, the Thomses demonstrated that Young claimed to smell a strong odor of marijuana that could have only emanated from an enclosed building approximately 450 feet away. The building was equipped with a carbon filtration system. There was a two-story residence atop a hill and substantial vegetation obstructing the only possible source of odor. Young was in a moving vehicle with his driver's side window partially down in February. Significant portions of the defendants' case hinge on Thoms' own testimony and the testimony of an expert in the field of smell detection.

## A. Defendants' Witnesses

### 1. Thoms' Testimony

The government maintains that because Thoms is "a practitioner of deceit," and a convicted felon, his "capacity for telling the truth [is] in doubt."[26] The government also maintains that "the substance of his testimony is of doubtful worth."[27] Under some circumstances, the court would be skeptical of the testimony of a defendant in Thoms' position. Because important elements of Thoms' testimony were corroborated by other witnesses–including government witnesses–and government exhibits, the court's skepticism is diminished accordingly.

---

[25]*See, e.g.*, *United States v. Forrester*, 616 F.3d 929, 949 (9th Cir. 2010) (internal quotations omitted) (describing the government's burden of proof at sentencing); *Sanchez v. Monumental Life Ins.*, 102 F.3d 398, 404 (9th Cir. 1996) (describing a removing defendant's burden of proof).

[26]Doc. 169 at 3.

[27]*Id.* at 4.

### 2. Doty's Testimony and Opinion

Thoms also offered the testimony of Dr. David Doty ("Doty"). Doty is the director of the Smell and Taste Center at the University of Pennsylvania School of Medicine.[28] He has published over 170 peer-reviewed articles in various fields. He edited, contributed to, and is "best known" for The Handbook of Olfaction and Gustation, a highly regarded work in the "chemical sense field."[29] Doty helped develop the University of Pennsylvania Smell Identification Test, which is "sort of the gold standard for smell testing."[30] He was qualified as an expert on smell and taste detection and smell detection capabilities.[31] Doty ultimately opined that there was a "zero" probability that Young smelled marijuana as he claimed.[32]

The report notes that Doty has only participated in two relatively small studies relating specifically to the smell of marijuana and that those experiments "were limited to the rather specific conditions on which they were performed."[33] Although the experiments were purposely targeted, there are "no other studies in the literature that have looked at marijuana odor from the perspective of capabilities of people being able to detect it under certain conditions."[34] Doty's expertise should not be discounted based on the particularity of the experiments he has conducted when those are the only experiments in the relevant field.

The report also discounts Doty's testimony because he did not address "the accumulative effect of any odor of marijuana that could have come from [the outbuilding containing the budding plants] and stagnated near the vicinity where . . . Young

---

[28]Doc. 164 at 105, 106.

[29]*Id.* at 112.

[30]*Id.* at 113.

[31]*Id.* at 125.

[32]*Id.* at 160.

[33]Doc. 174 at 25.

[34]Doc. 164 at 127.

-7-

purportedly" smelled marijuana.[35]  It is likely that Doty did not consider that possibility because the other variables precluded it.  Moreover, although Young stated that on the morning in question "[i]t was fairly calm [and] wasn't very breezy,"[36] his having detected any odor of marijuana at all was necessarily dependent on a favorable wind current, given that the source was over 400 feet away.  Any such wind would presumably have prevented stagnation.

The report notes that "Dr. Doty based his opinion in part on the fact that [Young's] window to his vehicle was up during the time he made his observation."[37]  Although Doty may have mistakenly understood that Young's window was completely up, the effect of the car window was presented at the hearing as an afterthought.[38]  Doty's written opinion includes no mention of Young's window as a barrier to odor whereas all other variables are discussed.[39]  The report incorrectly found that "Doty assumed that the distance from the marijuana source" to Young's position when he claimed to smell marijuana "was about 1000 feet."[40]  Doty's written opinion contemplated a "distance of [approximately] 500 feet."[41]

The report states that Doty "was not apprised of the number of marijuana plants seized by law enforcement" pursuant to the search.[42]  That statement is incorrect.  It is clear from Doty's discussion of the documents he reviewed to formulate a basis for his

---

[35]Doc. 174 at 30.

[36]Doc. 167 at 87, 120.

[37]Doc. 174 at 31.

[38]*See* doc. 164 at 159.

[39]Doc. 153-6 at 2–3.

[40]Doc. 174 at 30.

[41]Doc. 153-6 at 2.

[42]Doc. 174 at 32.

opinion, and from his written opinion in which he describes the number of plants found in one of the outbuildings, that he was apprised of the number of plants seized.[43]

The report ultimately concludes that "Doty's opinion is entitled to little weight because the factors upon which he based his opinion involved generalizations and speculation as to the actual weather and uncertainty as to whether the odor of marijuana could have escaped the [outbuilding] on [the Thomses'] property."[44]  The court disagrees with that assessment.  Although Doty's opinion that Young could not have smelled marijuana may be entitled to less weight, his expertise is equally valuable for the principles guiding formulation of that opinion.  The principles governing dispersal of odor are probative of the likelihood that Young–or anyone else–could have smelled marijuana as he claimed, independent of Doty's conclusion.  The inability of Doty to know, for example, the precise wind speed and direction at the Thomses' residence at 1:20 a.m. on February 22, 2010, does not preclude the court's application of the general principles that Doty articulated, based on, for instance, Young's characterization of the weather that morning.[45]

For similar reasons, it is insignificant that Doty did not visit the Thomses' property, that he "never inspected the actual filters and had no independent knowledge of whether the filtration system was working on the date in question."[46]  Doty's testimony explicitly assumed that the filtration system was functional.  The court must assess whether it was based on the evidence presented at the hearing.  A lack of personal knowledge as to whether the system was saturated should not affect the weight given Doty's opinion when his opinion obviously assumed that the system was in working order.

_____

[43]Doc. 153-6 at 1–2, 2.

[44]Doc. 174 at 33.

[45]The report notes Doty's conclusion "from the weather report that at the time [Young claimed to smell marijuana] there was no prevailing wind."  *Id.* at 32.  Doty's assumption is consistent with Young's testimony that it was relatively calm.  Doc. 167 at 87.

[46]Doc. 174 at 32.

-9-

### 3. Lay Witnesses

The Thomses presented the testimony of two lay witnesses who did not smell marijuana on the their property while visiting at different times. The report noted that those witnesses were "untrained in the act of olfactory observation."[47] Because smell is a sensory perception, no training is necessary. Any probative value is derived from those witnesses' firsthand perception.

## B. The Thomses' Showing

### 1. Filtration

The only marijuana that could have produced an odor detectable by Young was housed in a dedicated structure with no windows.[48] There were two doors and two garage doors.[49] The garage doors were insulated and taped.[50] Thoms testified that he employed "a carbon filter, approximately four feet high, with an eight-inch hole [to accommodate] a fan that's designed just for the filter."[51] There was an intake hole, near the entry of the building, approximately eight inches in diameter.[52] The filtration system created a vacuum such that outside air would be drawn into the building and all air that left the building would go through the carbon filter.[53] The filtration system ran continuously.[54]

Thoms described the system as follows:

Air comes from the roof, the attic, into the building. Halfway through the building is my charcoal filter, at least a four-foot charcoal filter [that

---

[47]*Id.* at 17.

[48]Doc. 164 at 78.

[49]*Id.* at 79.

[50]*Id.* at 79.

[51]*Id.* at 60.

[52]*Id.* at 96.

[53]*Id.* at 61, 102.

[54]*Id.* at 99.

-10-

weighs] a good 100 pounds, with a pre-filter on it, [that] takes out all the dust so the carbon doesn't get plugged, with a fan . . . sucking air through the filter, kind of like you would have for . . . your car.  It's spitting the air out, passing by at least three [ionizers] up and out the building.[55]

Doty opined that carbon functions as an "excellent" filter.[56]  Doty testified that "one of the reasons why charcoal works so well is it has a very high surface area . . . so when molecules go through charcoal, [they] get[] absorbed into the . . . charcoal."[57]  Doty recognized that carbon can become saturated and that carbon filters have to be changed "occasionally" in order to maintain their efficacy.[58]  Thoms stated that he purchased new carbon filters "weekly"[59] and that he kept "two spares and one hanging."[60]  New filters are visible in the government's Exhibit 11.  Thoms stated that he had a dedicated ladder positioned to check the effectiveness of the filtration system.[61]  He stated that he checked it "constantly."[62]  The ladder is visible in government exhibit 7.

---

[55]*Id.* at 101.

[56]*Id.* at 145.

[57]*Id.* at 139.

[58]*Id.* at 145.

[59]*Id.* at 74.

[60]*Id.* at 74.

[61]*Id.* at 83.

[62]*Id.* at 63.

Case 3:10-cr-00069-RRB   Document 186   Filed 04/22/11   Page 11 of 25

Within the ductwork itself, Thoms installed ionizers.[63]  Ionizers rely on ozone to bond with molecules responsible for scent.  Thoms stated he had five or six ionizers in place.[64]  The effectiveness of ionizers is questionable.[65]

The report notes the defendants' contention that "nothing in the government reports indicates that the [filtration] system was broken down."[66]  The report does not give much weight to the defendants' evidence that it was functional–it notes that "an assessment of the condition of the filter system was not performed before the equipment was disassembled because the condition of the equipment was not then at issue."[67]  The report omits that no assessment could be performed because State Trooper William Welch ("Welch") accidentally dropped the filter while disassembling it, and the filter broke open.[68]

The Thomses presented evidence that the filtration system was functional.  Thoms' testimony was substantiated by government exhibits and testimony.  The government did not attempt to refute Thoms' testimony and was not able to definitively refute that testimony because the primary filter that was in place when Young claimed to smell marijuana was irreparably damaged while being disassembled.  It requires an additional inferential step to conclude that the filtration system was not functional beyond what is needed to conclude that it was working.  The court sees no reason to take that additional step.  The Thomses established by a preponderance of the evidence that the filtration system was functional.

---

[63]*Id.* at 60.

[64]*Id.* at 76.  Young stated that he believed only two ionizers were seized.  Doc. 167 at 76.  Because their effectiveness is suspect, the precise number of ionizers in place is not critical.

[65]Doc. 164 at 145 (Doty noted that "there's some question about ionization."); doc. 167 at 76 (Young opined that ionizers are "not very effective.").

[66]Doc. 174 at 29.

[67]*Id.*

[68]Doc. 167 at 60.

-12-

## 2. Distance

Thoms stated that the distance from the gate on his property to the outbuilding containing the budding marijuana plants was approximately 550 feet.[69]  Defendants' private investigator measured the distance from the gate to the same outbuilding at 538 feet.[70]  Young estimated the distance to be between 400 and 600 feet.[71]  The court is satisfied that Young was at least 450 feet from the only potential source of odor when he claimed to smell marijuana.

Doty testified that "as you get farther from the . . . source" an odor becomes less strong.[72]  "[B]ecause odors are dispersed in air . . . any kind of air pattern will disperse the molecules to the point that they're not . . . concentrated enough to be . . . perceived."[73]  The report notes that "Doty stated that distance affects the strength of odor but he did not have an equation to be more specific."[74]  The court is skeptical that such an equation exists because there are too many other variables such as "[t]he velocity of air, [the] density of air [and] the volatility of the chemical."[75]  The pertinent aspect of Doty's testimony in this regard is that the greater the distance from the source, the less likelihood of detecting an odor.

---

[69]Doc. 164 at 53.

[70]*Id.* at 32.

[71]Doc. 167 at 120.

[72]Doc. 164 at 141.

[73]*Id.* at 141.

[74]Doc. 174 at 29.

[75]Doc. 164 at 136.

-13-

### 3. Weather

Doty testified that "in the winter . . . odors . . . don't move around very well."[76]  In warm temperatures air disperses more.  In cold air there is less movement.[77]  Doty stated that when warmer molecules responsible for any odor reach cold air, they tend to cool down and drop.[78]  Young's affidavit states that he smelled marijuana at 1:20 a.m. on February 22, 2010. On February 22, 2010, at the Wasilla Airport–approximately four miles from the Thomses' residence–the temperature at 1:16 a.m. was 29 degrees Fahrenheit.[79]

Doty stated that "wind disperses everything."[80]  The court has concluded that Young's description of the wind is a better indicator than the weather reports provided by the defendants. Young stated "[i]t was fairly calm, it wasn't very breezy,"[81] but that any wind was coming from the direction of the Thomses' residence.  Doty's testimony suggests that, to the extent the wind was blowing, it would act as a catalyst to dispersal of any odor.

### 4. Vegetation, Land Mass, and Structures

Directly in between the only potential source of odor and the location where Young claimed to smell marijuana there is a large section of forest and a two-story

---

[76]*Id.* at 133.

[77]*Id.* at 137.

[78]*Id.* at 148.

[79]Doc. 163-2 at 3.

[80]Doc. 164 at 139.

[81]Doc. 167 at 87, 120.

-14-

residence on top of a hill.[82]  The forest contains both deciduous and non-deciduous trees.[83]

Doty testified that foliage acts as a barrier to dispersal of an odor.[84]  Molecules responsible for a particular smell "as they traverse will bind to things, and . . . foliage . . . will take up molecules."[85]  Doty stated that "an uphill gradient . . . would spread [the odor] all over the place."[86]  He described the hill as "a significant barrier."[87]

### 5. Sensory Perception of Lay Witnesses

The Thomses offered the testimony of Yukon Tanner ("Tanner"), a safety manager for Matanuska Electric Association.  Tanner was called to the scene of the search to investigate possible electrical theft.[88]  When Tanner arrived at the scene, his car window was up, and his heater was running.[89]  Tanner did not smell marijuana on the Thomses' property until he entered one of the outbuildings, even though the door to that outbuilding was ajar.[90]  Tanner did not smell marijuana when he checked the electrical meter on the house.[91]  Tanner is 60 years old and his nose "doesn't work like it used to," but he is familiar with the smell of marijuana.[92]  Tanner has investigated

---

[82]See, e.g., doc. 153-14.  See also doc. 153-13; doc. 153-14.  Young's location when he claimed to smell marijuana is marked with an "X" on defendants' Exhibit K.

[83]Government Exhibit 6 provides the best sense of the density of the forested area. Defendant's Exhibit I offers the best sense of its depth.  See doc. 153-13.

[84]Doc. 164 at 138.

[85]Id. at 138.

[86]Id. at 139.

[87]Id. at 148.

[88]Doc. 167 at 5.

[89]Id. at 16.

[90]Id. at 7–8, 9, 12–13.

[91]Id. at 8–9.

[92]Id. at 10.

-15-

electricity theft at 20 or 25 grow operations.[93]  Tanner has "been on properties where [he] could smell [marijuana] as far away as the street."[94]

Thoms presented the testimony of Brian Brett ("Brett"), a driver for Alaska Waste.  Brett collected refuse at the Thomses' house on the last Friday of every month. Brett was on the Thomses' property on the last Friday of January 2010.[95]  Brett generally did not get out of his vehicle while on the property and does not recall whether his windows were up or down when he visited in January.[96]  He testified that he never smelled marijuana on the Thomses' property.[97]

## C. The Government's Witnesses

The government's primary contentions in rebutting Thoms' showing are that 1) Young claimed he smelled marijuana; and 2) execution of the search warrant yielded 202 budding marijuana plants.[98]  Young's statement in the affidavit is entitled to a presumption of validity, and it was corroborated by the fruits of the search.[99]  In addition to Young, the government called State Troopers Curtis Vik ("Vik") and Welch as witnesses.

### 1. Inconsistencies in Young's Statements

Young's affidavit attested to his knowledge "that marijuana contains 'terpenes' that generate an odor that is unique only to marijuana and therefore the odor of the marijuana plant is readily recognizable."[100]  On direct examination at the *Franks* hearing,

---

[93]*Id.* at 10.

[94]*Id.* at 13.

[95]*Id.* at 18.

[96]*Id.* at 23.

[97]*Id.* at 22.

[98]Although the search uncovered approximately 500 marijuana plants in total, Young conceded that he could only have possibly smelled budding plants.  *Id.* at 141.

[99]*See Franks*, 438 U.S. at 171.

[100]Doc. 57-3 at 3, 4.

-16-

Young stated that in his experience, however, "a trapping bait . . . has that skunky smell which marijuana is kind of similar to."[101]  While the discrepancy is easily explained–the former representation that marijuana's odor is unique is attributed to someone else–it is unclear, if Young knew from his own experience that the odor of marijuana was not unique, why the affidavit would attest to another's claim that it was.

Young's affidavit also states that, after smelling the strong odor of marijuana while in his vehicle, he got out, "continued to check the wind direction and determined that *the first residence on the right* . . . was the source of the odor."[102]  It appeared to him that "there [was] a pond or swamp behind the residence and no other nearby structures (upwind) that could have been the source of the odor."[103]  Young's affidavit indicates a belief that the house itself was the source of the odor.  Similarly, Young testified at the *Franks* hearing that "the Thoms residence was directly upwind of where [he] was at" when he smelled marijuana outside his vehicle.[104]  During cross-examination, Young testified that "based on the wind direction, that the source of the odor was coming from the Thoms property."[105]  Also during cross-examination, Young stated that he "believed it was from that property, not necessarily just [the] house."[106]  Young's statements during cross-examination are inconsistent with representations in the affidavit.

### 2.  Young's Smelling Ability Relative to Vik and Welch

Vik testified that the furthest distance he has ever smelled marijuana from the source was "a couple hundred yards."[107]  On the day of the search, he first smelled

---

[101]Doc. 167 at 68–69.

[102]Doc. 57-3 at 4 (emphasis added).

[103]*Id.*

[104]Doc. 167 at 87.

[105]*Id.* at 117.

[106]*Id.* at 121.

[107]*Id.* at 43.

marijuana when he was "fifty to seventy-five feet" away from the source.[108]  Vik could not smell marijuana from the Thomses' residence.[109]  Welch testified that he has detected the smell of marijuana from "over a mile" away.[110]  On the day of the search, he did not smell marijuana as he approached the outbuildings on the Thomses' property.[111]  He did not smell marijuana at all until he "entered the first building."[112]  Welch did not smell the budding marijuana plants until "trying to gain entry into" the building housing them.[113]

Young believes that he does "not have . . . a really good sense of smell."  He has "had contact with people that have been consuming alcohol, and other troopers would say they could smell it [but he] never noticed it."[114]  Similarly, Young stated that he has been unable to smell odors detected by family members.[115]

Of those who testified at the *Franks* hearing, one other individual besides Young–Vik–claimed to smell marijuana on the Thomses' property prior to entering a building containing it.  Vik was one-ninth the distance from the source that Young was when he claimed to smell marijuana.  The path that the odor would have traveled to Vik's position when he smelled marijuana was approximately 90% less distant and unobscured by vegetation or the Thomses' house.  The law enforcement officer with past experience detecting the smell of marijuana from over a mile away was unable to

---

[108]*Id.* at 48.

[109]*Id.* at 49, 50.  The report erroneously stated that Vik "did smell marijuana at or near the Thoms residence."  Doc. 174 at 20.

[110]Doc. 167 at 54.

[111]*Id.* at 57.

[112]*Id.* at 58.  This was building number 1 on defendants' exhibit V.  It contained only vegetative plants.

[113]*Id.* at 59.

[114]*Id.* at 110.

[115]*Id.* at 110.

-18-

recognize any odor until he entered the building containing the budding marijuana plants.

**D. The Government's Rebuttal**

**1. Filtration**

The government sought to establish at the *Franks* hearing that one of the two grow buildings was not equipped with charcoal filtration.[116]  According to Young, however, "the upper floor" of the building did have such a system.[117]  In any event, the building only contained vegetative marijuana plants.[118]  Consequently, even if there were no filtration system at all in that building, it is immaterial.  Young stated that he had to have been smelling budding plants.[119]

Young testified that his experience with charcoal filtration was limited to the use of respirators "when we do meth labs [and] when we're tearing down a large marijuana grow, because of the molds and some other dangerous inhalation hazards."[120]  Young's testimony that the canisters used in his respirators are "a one-time use" because "we don't know when they're going to be saturated" is not probative of the efficacy of Thoms' filter.[121]  Welch's testimony suggests that the carbon filter Thoms had in place weighed approximately one hundred pounds.[122]  Consequently, OSHA regulations that require one-time use of personal respirators does not bear on the effectiveness of Thoms' filtration system.  Young's testimony does establish that the Alaska State Troopers also

---

[116]*Id.* at 92–93.

[117]*Id.* at 92.

[118]*Id.* at 92.

[119]*Id.* at 141.

[120]*Id.* at 74.

[121]*Id.* at 74.

[122]*Id.* at 60.

Case 3:10-cr-00069-RRB   Document 186   Filed 04/22/11   Page 19 of 25

use carbon filtration under certain circumstances. That fact renders one interpretation of Young's testimony that carbon filters are "not always effective" suspect.[123]

### 2. Distance

As discussed above, Young was approximately 450 feet from the only potential source of the odor. By his own estimate, based on his time on the property during the search, Young was "somewhere between 400 to 600 feet" from the building containing the budding plants.[124] During cross-examination, Young confirmed his belief, reflected in the affidavit, that "there were no other structures visible upwind. It looked like there was a swamp behind [the residence]."[125] Young concluded that the residence had to be the source because there were no other structures "upwind or *close enough to be the source of the odor.*"[126] Young continued to say that he "believed [he had] isolated the source of the odor because there [were] *no other structures close to have been it.*"[127]

The fact that Young could see the vegetation behind the Thoms' house and ruled out anything beyond that point as the source of odor is in tension with his having actually smelled marijuana. Young's statements on cross-examination also make clear that even he did not think that anything beyond the trees behind the Thoms' residence could have produced the odor he claimed to smell.

### 3. Weather

Young stated at the *Franks* hearing that, on the morning of February 22, "[i]t was fairly calm, it wasn't very breezy."[128] This is consistent with his testimony that "[i]f it's windy, [he] won't bother" with "going out to try to smell for a marijuana grow."[129]

---

[123]*Id.* at 73.

[124]*Id.* at 120.

[125]*Id.* at 122.

[126]*Id.* at 122 (emphasis added).

[127]*Id.* at 122 (emphasis added).

[128]*Id.* at 87, 120.

[129]*Id.* at 78.

-20-

However, by virtue of the distance to the only potential source of odor, Young's ability to have smelled marijuana was dependent on wind current. It is difficult to conceive how an odor could have traveled over 400 feet in the middle of winter–above or through forest and above or around the Thoms' home–when"[i]t wasn't breezy at all."[130] Young's testimony as to the lack of a strong wind does not mesh with his statement that the odor was "strong" insofar as it is unclear how a sufficient concentration of an odor could have reached the point where Young claimed to smell marijuana without dispersing absent a strong wind.[131]

Young detailed his methods of determining wind direction. Because Young typically investigates marijuana grows at night, he shines the lower stage bulb on his flashlight "directly up in the air," he "breathe[s] out and . . . watch[es] which way [his] breath drifts."[132] When Young cannot see his breath, he uses a "finger in the air."[133] Young stated that he made his assessment that the wind was coming from the Thomses' residence in "four to five minutes."[134] He stated that he came to that conclusion after "walking back up and down [the road adjacent to the Thomses' property] several times."[135] Young eliminated four other structures from consideration in that same time and using those procedures.[136]

Vik testified that the wind in the Palmer-Wasilla area varies dramatically and can change over short periods of time.[137] Welch testified that in his experience the wind in

---

[130] *Id.* at 120.

[131] *Id.* at 88. Even if there were a strong wind, Doty confirmed the intuitive premise that wind disperses odor.

[132] *Id.* at 86.

[133] *Id.* at 86.

[134] *Id.* at 117.

[135] *Id.* at 117.

[136] *Id.*

[137] *See id.* at 41.

-21-

the Palmer-Wasilla area can vary over short distances.[138]  Young testified that the wind in the Palmer-Wasilla "blows from all corners of the compass" and can vary over short distances and periods of time.[139]  The court accepts the troopers' personal experience with respect to wind variation in the Palmer-Wasilla area.  It is not especially probative because the court accepts Young's description of the conditions near the Thomses' property on the morning of February 22, 2010, as reasonably accurate.

## E. Thoms Has Met His Burden For Purposes of the *Franks* Hearing

To conclude that Young did smell marijuana from the road, while in his vehicle would require the court to assume that Thoms' filtration system was either saturated or not functional; that the odor of marijuana left the outbuilding unfiltered and remained warm long enough to stay above the vegetation behind the Thomses' house; that it either traveled around the Thomses' two-story residence or stayed warm long enough to traverse above it then suddenly dropped in the area Young claimed to smell marijuana; and that it followed the described 450 foot course without dispersing beyond perceptible levels.  Those assumptions are contrary to a preponderance of the evidence presented at the *Franks* hearing.

## F. Without the Averment that Young Smelled Marijuana, the Affidavit Does Not Support a Finding of Probable Cause

Probable cause exists where the totality of the circumstances give rise to "a fair probability that contraband or evidence of a crime will be found in a particular place."[140]  Setting aside the alleged falsity, the only relevant allegations in the warrant affidavit specific to the defendants are 1) Trace Thoms' 2005 conviction for MICS IV and 2) two electrical accounts in the name of Jennifer Thoms, one of which used approximately $800 worth of electricity per month.

High electricity usage cannot support a finding of probable cause on its own–it has been treated by the Ninth Circuit Court of Appeals as "weak evidence of criminal

---

[138] *Id.* at 52.

[139] *Id.* at 66–67.

[140] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

-22-

activity."[141]  While, for instance, thermal imaging can increase the probative value of high electrical usage, there is no similar relationship between a past criminal conviction and such electrical usage.[142]  Abnormally high electrical usage credited to an account in the name of one spouse coupled with the other spouse's past criminal conviction involving marijuana does not give rise to a fair probability that evidence of a crime will be found on a married couple's property.[143]  The statement that Young smelled marijuana was essential to a finding of probable cause.

### 1. The Good Faith Exception Does Not Apply

The Ninth Circuit has "refused to suppress evidence obtained under an invalid warrant if the officers obtaining the warrant and performing the search relied in good faith on the warrant's validity."[144]  However, the good faith exception does not apply to situations "when an affiant has knowingly or recklessly included false information in the affidavit."[145]

Even if the good faith exception could apply where a defendant has satisfied his burden at a *Franks* hearing, it would not apply here.  In determining applicability of the

---

[141]*See United States v. Huggins*, 299 F.3d 1039, 1048 & n.11 (9th Cir. 2002) ("[A]lthough thermal imaging does not reveal direct evidence of crime, it can serve as a means of corroborating direct but weak evidence of criminal activity–such as the informant's tip that triggered the investigation . . . .  Thermal imaging can also bolster the probative value of comparative electrical data by indicating that whatever power-intensive activity is occurring on the premises under surveillance is also one that generates significant heat; this information rules out some, albeit not all, innocent explanations for the target location's relatively high power bills."); *see also United States v. Robinson*, 62 F.3d 1325, 1331 (11th Cir. 1995) (high relative electricity consumption bolstered by infrared imaging, purchase of high-powered lights, and an expensive residence despite no state income tax returns on file).

[142]*See Huggins*, 299 F.3d at 1048.

[143]*See United States v. Clark*, 31 F.3d 831, 835 (9th Cir. 1994) (High electrical "consumption is consistent with numerous entirely legal activities.  This evidence, which is equally consistent with both legal or illegal activity, coupled with an entirely uncorroborated anonymous tip, is simply not sufficient to establish probable cause for searching a home.").

[144]*Id.*

[145]*Dozier*, 844 F.2d at 705; *see generally United States v. Leon*, 468 U.S. 897 (1984).

Case 3:10-cr-00069-RRB   Document 186   Filed 04/22/11   Page 23 of 25

good faith exception, "the inquiry is one of objective reasonableness."[146]  Here, "a reasonably well-trained officer would have known that this particular search was illegal despite the [state] judge's authorization."[147]  High electrical consumption is relevant to but inadequate for a determination of probable cause.  Even in conjunction with a 2005 conviction for delivery of marijuana, a reasonably well-trained officer could not have thought that information sufficient to constitute probable cause.

## G. Suppression

"A district court *must* suppress evidence seized under a warrant when an affiant has knowingly or recklessly included false information in the affidavit."[148]  Moreover, because the other search warrants were derived from execution of the invalid warrant,[149] the evidence seized pursuant to the other search warrants must also be suppressed.[150]

## H. Thoms' Other Objections Are Moot

Because the court has concluded that the Thomses' first objection to the findings of the report has merit, the Thomses' other objections are moot.

## V.  CONCLUSION

For the reasons above, the report and recommendation at docket 174 is **REJECTED**.  The motion at docket 57 is **GRANTED** as follows:

1) The evidence derived from execution of Search Warrant No.3PA 10-56 SW is suppressed.

---

[146]*Clark*, 31 F.3d at 835.

[147]*Id.*

[148]*Dozier*, 844 F.2d at 705 (emphasis added).

[149]*See* doc. 153-3 at 6–7; doc. 153-4 at 6–9.

[150]*Wong Sun v. United States*, 371 U.S. 471 (1963) (The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.") (internal quotations omitted).

2) The evidence derived from execution of Search Warrant No.3PA-10-59 SW is suppressed.

3) The evidence derived from execution of Search Warrant No.3PA-10-74 SW is suppressed.

The United States shall promptly advise the court how it will proceed given the court's decision to suppress evidence.

DATED at Anchorage, Alaska, this 22nd day of April 2011.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE